Filed 11/7/13  In re Sofia C. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re SOFIA C., a Person Coming Under the Juvenile Court Law. | B247956<br>(Los Angeles County<br>Super. Ct. No. CK85623) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>THOMAS V.,<br><br>    Defendant and Appellant;<br><br>E.C.,<br><br>    Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County.  D. Zeke Zeidler, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant Thomas V.

No appearance on behalf of Plaintiff and Respondent.

Grace Clark, under appointment by the Court of Appeal, for Defendant and Respondent E.C.

No appearance for Minor.

\* \* \* \* \* \*

Thomas V. (Father) appeals from a Welfare and Institutions Code[1] section 366.26 order terminating his parental rights to his daughter, Sofia C. (the child). Father claims the trial court abused its discretion in denying his section 388 petition and committed reversible error in failing to apply the section 366, subdivision (c)(1)(B)(i) exception to termination of parental rights. The Los Angeles County Department of Children and Family Services (Department) has not filed an opening brief as it was aligned with Father in the juvenile court. E.C. (Mother) has filed an opening brief in support of the juvenile court's order denying the section 388 petition and terminating parental rights. We affirm the order terminating parental rights in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

The Department filed a section 300 petition on behalf of the three-day-old child in December 2010. As sustained, the petition alleged the child was born suffering from a detrimental condition consisting of a positive toxicology screen for amphetamine and methamphetamine. The condition could not have existed except as the result of Mother's unreasonable acts, which placed the child at serious risk of physical and emotional harm. Mother had a positive toxicology screen for amphetamine and methamphetamine at the time of the child's birth. Father failed to take action to protect the child when he knew of Mother's illicit drug use. Mother's substance abuse and Father's failure to protect the child endangered and placed at risk the child's physical and emotional health and safety.

The sustained petition further alleged Mother had a history of substance abuse including cocaine and marijuana. Mother was a current user of amphetamine and methamphetamine which rendered her incapable of providing regular care for the child.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

Mother used amphetamine and methamphetamine while she was pregnant with the child. Mother's substance abuse endangered the child's physical and emotional health.

The sustained allegations against Father were that he had a history of substance abuse and was a current user of methamphetamine, which rendered him incapable of providing regular care for the child. Father's substance abuse endangered the child's physical and emotional health and safety and created a detrimental home environment placing the child at risk.

The Department's detention report stated the child had been placed with R.N. (Step-Maternal Grandmother). The report also outlined 23-year-old Mother's drug abuse history which, according to M.C. (Maternal Grandfather), dated back to when she was 14 or 15 years old. Mother stated she first used marijuana recreationally. She began smoking methamphetamine when she was 18 years old. Mother smoked "'about $20'" each time. Mother smoked off and on for a while. Mother then began smoking twice a week until she stopped in June 2010 when she found out she was pregnant. Mother used methamphetamine the first trimester of her pregnancy because she did not know she was pregnant. Mother stated that Father and she smoked methamphetamine together. They were together for two years during which time they used drugs together.

Maternal Grandfather stated Mother met Father when she was about 20 or 21. When Maternal Grandfather visited their home, he observed security cameras outside the home and padlocks on the door. Mother asked Maternal Grandfather if he knew where Father could get a water meter for Father's new "'agriculture business.'" The house smelled of marijuana and Maternal Grandfather observed marijuana plants in the home. Mother showed Maternal Grandfather a medical marijuana card. Maternal Grandfather's son told him Father was a drug dealer. Maternal Grandfather believed Father was a dealer because of the plants and individuals going in and out of the home.

During Mother's pregnancy, Maternal Grandfather and his wife attempted to get Mother the help she needed to treat her addiction. Mother received inpatient drug treatment until August 2010. According to Maternal Grandfather, Mother was kicked out of the treatment center. When Mother was kicked out of the drug treatment center in

3

August 2010, he allowed her to stay in their home in November 2010. Mother was given rules she had to follow if she wanted to live in the home. On November 22, 2010, Maternal Grandfather noticed on more than one occasion, that during Mother's last week of pregnancy she would have a "burst of energy." L.S. (Maternal Grandmother) suspected Mother used drugs during the last week of the pregnancy when Mother went out to dinner with Father. Mother admitted to Maternal Grandmother that Father grew marijuana for sale.

At the detention hearing, the juvenile court found Father to be the presumed father. The child was detained. The parents were given family reunification services and monitored visits and the Department was given discretion to liberalize visitation. Father would be allowed unmonitored visits once he enrolled in a program and tested clean. The Department was ordered to explore the possibility of giving the paternal grandparents visits every other weekend and have them act as Father's monitors.

In an interim report, the Department stated that efforts to evaluate the paternal grandparents' home were unsuccessful. Paternal Grandmother expressed skepticism about the child's paternity. She was willing to have the placement if it was Father's child but she needed "a DNA." The paternal grandparents did not attend a scheduled interview.

In the jurisdiction/disposition report, the Department stated Father was not sure if the child was his. Father did not appear for drug testing on December 8, 2010 and December 20, 2010. Father did not return the social worker's call regarding a live-scan request for the paternal grandparents. Father also did not appear for a scheduled interview with the social worker.

When Father visited with the child on December 3, 2010, he was accompanied by the paternal grandparents and an unknown female. Paternal Grandmother asked for a paternity test at the visit. Father missed visits on December 5, 8, and 19, 2010 and did not call to cancel or reschedule the visits. Father did not appear on December 15, 2010 after confirming a visit. On December 22, 2010, he called at 7:51 p.m. for a scheduled

4

7:30 p.m. visit. When Father showed up, the baby was asleep. Father appeared to be high. His eyes were droopy. His speech was mumbled, rapid and difficult to understand.

A contested jurisdiction/disposition hearing was held on April 27, 2011. The juvenile court sustained 3 counts under section 300, subdivision (b) and dismissed one count. The Department was ordered to provide family reunification services. Father and Mother were given monitored twice weekly visits with discretion to liberalize. Father and Mother were ordered to participate in individual and drug counseling. Father and Mother were ordered to submit to random drug testing.

By October 2011, Father was living in Redding, California and had only visited the child three times. Each time, the Step-Maternal Grandmother observed Father appeared to be under the influence of drugs. Father did not engage the child during the visits. Father did not comply with the case plan and did not drug test. After contacting the social worker to inform her of his decision to relocate to Redding, Father requested a good-bye visit with the child. Father refused to have the visit after realizing the Step-Maternal Grandmother would monitor the visit and he did not offer an approved substitute monitor.

The child was living with Step-Maternal Grandmother and Maternal Grandfather (caregivers), who wanted to adopt her. The child was observed to be happy, neatly groomed, clean and thriving. Her caregivers had a strong bond with her. Mother had not demonstrated a willingness to reunify with the child. Mother had stopped visiting around March 2011 and had no bond with the child. From the onset of the case until February 2011, Mother was in compliance with the case plan, which included increased visitation time with the child and overnight visits in the caregivers' home. However, on February 28, 2011, during a visit, Mother's eyes were extremely dilated. On March 25, 2011, Mother was discharged from a drug treatment program for lack of participation and missed drug tests.

In January 2012, the Department reported Father had enrolled on October 28, 2011 in an inpatient substance abuse program in Sacramento. The program had strict communication rules for the program participants so contact with Father was limited.

Father was transferred to the San Diego branch of the program on November 28, 2011. Father's counselor stated Father was active in the program, and the social worker stated that Father seemed to be committed to sobriety. However, Father's commitment to the child was uncertain because of his lack of communication with the social worker. Father had not visited with the child. Mother had not complied with court orders or the case plan. Mother's visits were inconsistent. The Department recommended that family reunification services be terminated and that a section 366.26 hearing be set.

On January 3, 2012, the juvenile court found Mother failed to comply with court orders and the case plan. The court terminated family reunification services for Mother. The matter was continued as to Father for a contested hearing.

In February 2012, the Department reported the child was doing well in her placement. The child was healthy and appeared to have a nurturing attachment to her caregivers. The child's daycare provider stated the child was incredibly bright, got along well with others, and was very happy and playful.

On January 13, 2012, the social worker provided Father with referrals to individual therapy, drug rehabilitation programs, drug/alcohol testing and parenting classes. Father also received a bus pass. The social worker confirmed that Father enrolled in parenting classes. There was a discrepancy concerning Father's participation in random drug testing because Father was listed as a no show on one document. Another form indicated Father appeared for the drug test. Father was given a referral for individual therapy on January 27, 2012, however, Father did not comply with the court order for individual therapy. On January 30, 2012, Father stated he had completed four months of substance abuse and wanted to focus on the parenting class and obtaining a job.

Father had six visits with the child during January 2012. The caregivers observed that Father appeared to be uncertain of how to relate to and bond with the child. Paternal Grandmother was present during all the visits. The child was still adjusting to Father and had not developed a healthy attachment to him. Father lacked the parenting skills and

6

confidence to appropriately care for the child. The visits were "of fair quality," however, it was "apparent" Father needed more parenting education.

In March 2012, the Department reported that Father was in partial compliance with the case plan. Father had four negative drug tests. The social worker encouraged Father to enroll in another substance abuse program as well as Narcotics Anonymous classes.

Father visited consistently with the child, who generally cried for the first five to ten minutes. She would then warm up to Father and be comfortable in his presence. Father was appropriate and attentive towards her needs. Father provided toys, food, coloring books and a baby laptop. Father would draw and play with the child. The child was observed running up and hugging Father on occasions. Because the visits had only occurred for two months, it was unclear how bonded the child was to Father.

Father informed the social worker that he was currently planning to divorce a woman whom he married in 2006 to assist her with her immigration status. Father stated that he never lived with the woman.

The Department assessed Father as willing and motivated towards reunifying with the child. Although he was making progress and was consistently visiting, the Department was concerned because Father was absent for a majority of the child's life. Father appeared determined to learn new parenting skills and to bond with the child. Father did not have confidence and had not developed a healthy attachment with the child. The Department recommended continued reunification services for Father and the child. On March 9, 2012, the juvenile court found Father was in compliance with the case plan.

In June 2012, the Department reported that since January 2012, Father had begun to make steps towards addressing the case issues that required intervention in the family. However, Father seemed to only "be going through the motions" or what he called department "hoops." Father was very resistant to doing individual therapy. He stated he did not understand why he needed to go. But, Father did enroll in individual therapy on April 13, 2012. Father's attendance was consistent and punctual. Father was candid

7

about his substance abuse issues and was receptive to feedback. Father appeared motivated to obtain custody of the child as he wanted to be a positive influence in her life.

Father enrolled in a drug rehabilitation program on March 5, 2012. Since January 26, 2012, Father had been participating in a 26-week parenting class. Father had been participating in drug testing with negative results for all substances since March 8, 2012. Father's visits with the child were consistent. Father came prepared with snacks and toys. The child was no longer frightened of Father. She would wave and smile when she saw him. However, it did not appear that the child had a strong attachment to Father. Father struggled on how to connect and relate to the child. Father did not call her by her name, rather, he called her "baby."

Father became upset when the social worker told him that reunification services were about him and the child and that the paternal grandparents could not be present during all of the visits. Paternal Grandmother claimed the Department would not let them see the "baby" even though she had twice a month visits. During one visit with the child on April 13, 2012, Father was disengaged from the child. He watched the paternal grandparents interact and play with the child. The child only appeared to be engaged with Paternal Grandfather and she did not seem comfortable with Father or Paternal Grandmother. Father said he wanted to step back so his parents could spend some time with the child.

The Department believed that the paternal grandparents were overly involved in Father's life. Paternal Grandmother frequently spoke on Father's behalf. It appeared Father lacked assertiveness skills. It was not clear whether Father was attempting to reunify with the child for himself or for his parents. Father deferred to his parents and allowed them to take charge. Father relinquished his parental authority role to his parents. Paternal Grandparents were in denial of Father's substance abuse. Paternal Grandparents minimized Father's long history of selling and using marijuana by saying Father only used for a short time. The Department was concerned about this family

8

dynamic because Father would be living with Paternal Grandparents, who had a strong interest in protecting Father, possibly to the detriment of the child.

The Department noted that Father had previously failed to provide the child with appropriate care, housing and supervision. Father did not have a strong attachment with the child, which could cause detriment to her emotional well-being. The child had a strong bond with her caregivers and had thrived while under their care.

The Department identified adoption as the appropriate permanent plan for the child. The prospective adoptive family (the maternal grandparents) had an approved adoptive home study. Their home provided stability and was appropriate for the child's needs. The child bonded to both Step-Maternal Grandmother and Maternal Grandfather. After the April 2011 disposition hearing, Father did not begin to comply with the case plan until January 2012. Prior to that time, Father visited the child only five times. Father did not call to check on her or have visitation. Father said he was struggling to get his life together and opted not to visit at all because the caregiver made his visits so painful.

While noting Father's enrollment in parenting classes, the Department indicated he lacked the parental skills needed to appropriately care for the child. The visits were of "fair quality" but Father needed more parenting education. The child was still adjusting to Father. It did not appear that she had developed "a deep and meaningful attachment" to Father.

In May 2012, the Department conducted a risk assessment regarding the possibility of reuniting the child with Father. The risk level was "high" for future abuse/neglect. Father did not have a healthy relationship with the child. Father also had a long history of substance abuse as well as a history of not being involved with the child. The Department recommended that the juvenile court terminate family reunification services for Father and set a permanent plan hearing.

In a last minute information for the court filed on June 4, 2012, the Department reported Father was not complying with court orders. Father attended nine group outpatient substance abuse program sessions and missed seven sessions. Father attended

9

ten classes at Valley Family Center and missed seven classes. On May 25, 2012, Mother told the social worker Father asked her if she wanted to go on a visit with him that day. Father was informed that his visits were only for him and Father stated he understood. The social worker later learned Father took the child to the Paternal Grandparents' home.

On June 4, 2012, the juvenile court continued the matter for a contested hearing to August 8, 2012. In a last minute information for the court filed on August 8, 2012, the Department indicated that its recommendation remained the same. On August 8, 2012, the juvenile court found the Department had made reasonable efforts to enable the child to be safely returned home. Father was in partial compliance with the case plan. But, the child could not be safely returned to the custody of her parents and there was no substantial probability she would be returned within six months. The court ordered family reunification services terminated for Father and set the matter for a permanent plan hearing on January 10, 2013.

On December 14, 2012, Father filed a section 388 petition requesting the juvenile court order the child returned to his care and custody. In the alternative, Father requested the court reinstate his family reunification services. Father asserted the order should be made because he had completed a 26-week parenting class and a six-month outpatient substance abuse program with no absences. Father also had tested clean and had consistently visited the child. Father asserted it was in the child's best interests to be returned to his custody because they "are extremely bonded." Father "has shown extreme dedication in completing his drug and parenting programs and has applied that in his connection and parenting of [the child]."

In its section 366.26 report filed on December 20, 2012, the Department noted that since November 2012, Father had unmonitored visits for about three hours twice a week. Father had "become more appropriate, nurturing and caring with [the child]." However, the Department continued to recommend adoption as the permanent plan. The Department stated that the child's Maternal Grandparents were her caregivers. They love the child and wanted to give her a stable and permanent home with them. The child had resided in their home since 2010. She was very bonded to her maternal grandparents,

who loved and cherished her. The adoption social worker stated: "There is no doubt their relationship is very much based on adoration."

On December 20, 2012, the juvenile court granted a hearing on the section 388 petition and set it for January 28, 2013. In the event the petition was denied, the matter would be followed by a contested section 366.26 hearing.

On January 9, 2013, the Step-Maternal Grandmother and Maternal Grandfather filed a request for de facto parent standing. The juvenile court granted the unopposed request on January 22, 2013.

The Department responded to Father's section 388 petition on January 22, 2012. The Department acknowledged that Father was in full compliance with the case plan. Father had completed the parenting classes, the substance abuse program, participated in therapy and was motivated to remain clean and sober. The Department noted that the Maternal Grandparents had done an excellent job of caring for and providing for the child's needs. But, based on Father's compliance and "dedication toward unifying with his child," the Department changed its recommendation to "the child be returned to father." The Department stated it was in the child's best interests "because father and child are extremely bonded." The Department recommended that the juvenile court grant the section 388 petition and take the section 366.26 hearing off calendar.

On January 28, 2013, the juvenile court held a hearing on the section 388 petition and conducted the permanent plan hearing. Father testified that he had unmonitored visits with the child since November 2012. The visits were initially for two hours and increased to three hours twice a week. They visited in the park or mall. Father wanted more time. Father had not had overnight visits.

Father testified that he had "very limited contact" with Mother. He tried to support her efforts to get sober. Father's last contact with Mother was about three weeks before the hearing by text message and face-to-face contact. Father was recommending to Mother the substance abuse programs he had completed. Mother contacted Father about a place to stay and Father paid for a hotel room for Mother. It was late so Father "ended up falling asleep there." Mother and Father met at a bowling alley near Mother's

11

house after the last court date. Mother wanted to discuss why she did not show up for the hearing. Father and Mother ended up talking in Mother's car. Father denied consuming alcohol during the conversation with Mother. Father had not consumed alcohol for "90 days" or "actually, 120 days." Father paid for Mother to have a drink at the bowling alley. Father could support the child but "a little less elaborate" style than she was accustomed to.

Father would abide by court orders concerning Mother's visits with the child including that he not act as monitor. Father was willing to drug test. Father was still in therapy and was involved in a 12-step sobriety program.

Mother testified that she saw Father on November 30, 2102. They were at the hotel room and had "partied" on November 29, 2012. According to Mother, they agreed to "meet up" and "get a hotel room." The two had started getting together and staying overnight "with each other in hotel rooms" since October 2012. Mother was currently using illegal substances and Father knew that she was.

Mother offered Father a "swig" of Coca-Cola and "Jim Beam" when they were in the car at the bowling alley. Mother thought Father was visibly under the influence of alcohol when she arrived at the bowling alley. Father asked Mother to move in with him as recently as January 5, 2013. More recently, Father had been texting Mother not to contact him. The two of them were not currently in a relationship.

Step-Maternal Grandmother testified that Father tended to run late for the visits. He occasionally made up the time at the end of the visit. The child was returned to the caregiver well-cared for and happy. The child was happy and loved everybody; everyone was her friend. She was happy to go to the park with Father. The child separated easily from him. The child seemed to be happy to return home and did not cry when Father left. When she needed comfort, the child turned to her maternal grandparents for help in Father's presence. Step-Maternal Grandmother thought that on the child's birthday in November 2012, Father was under the influence of something when he arrived for his visit. She also thought that he was under the influence on Memorial Day of 2012.

12

Father's attorney argued that the juvenile court should grant the section 388 petition. The Department's counsel agreed and asserted "at a minimum" the court should continue the matter or reinstate family reunification services and/or grant a home of parent father order with conditions.

The child's attorney requested that the section 388 petition be denied. Counsel asserted that Father had a substance abuse problem which the juvenile court ordered him to address in April 2010. Father took 18 months to complete the programs; but he did not timely resolve his issues concerning his newborn child. Counsel reminded the court that during the child's first year Father only visited three to five times and refused to participate in programs. When Father enrolled in a program after a year into the dependency proceeding, he still did not visit. Father was still having contact with Mother. And, there was evidence Father was drinking. It was not in the child's best interest to grant the section 388 petition because it would just delay her need for stability and permanence.

In denying the petition, the juvenile court stated: "I can't believe they graduated him from a program with only 60 days of sobriety from alcohol. I can't believe the department liberalized him to unmonitored after two plus—after two years with only 90 days under his belt from alcohol and not questioning the fact that the program gave him a completion just two months into his sobriety." The court further stated: "I can't figure out what's going on with this worker. This worker has some major bias in favor of this father. I don't know what it's based upon or what it is."

Father asserted parental rights should not be terminated because he had consistently visited with unmonitored visits since November 2012. It was not in the child's best interest to have parental rights terminated because Father and the child were bonded and close. The child's counsel asked the juvenile court to terminate parental rights as there was clear and convincing evidence the child would be adopted and no exception applied. The child was just a friendly baby and everyone was her friend.

The juvenile court found by clear and convincing evidence return to the parents would be detrimental. The child was adoptable. Although Father had maintained regular

13

and consistent visitation and contact, the child looked for comfort to her caregivers and not to Father. The consistent visitation and contact, even if it conferred a parental relationship, did not outweigh the benefits of permanence in adoption. The court then ordered parental rights terminated. Father filed this timely appeal.

## DISCUSSION

### I.    The Section 388 Petition

Father contends the juvenile court abused its discretion in denying his section 388 petition. Section 388 provides in part: "(a)(1) Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition shall be verified and . . . shall set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order or termination of jurisdiction."

Section 388, subdivision (d) provides in part: "(d) If it appears that the best interests of the child . . . may be promoted by the proposed change of order, modification of reunification services, custody, . . . termination of jurisdiction, . . . the court shall order that a hearing be held and shall give prior notice, or cause prior notice to be given, to the persons and in the manner prescribed by Section 386, and, in those instances in which the manner of giving notice is not prescribed by those sections, then in the manner the court prescribes."

We must determine whether the juvenile court abused its discretion in determining it was not in the child's best interests to reopen Father's reunification services. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Because Father's section 388 modification petition was filed after reunification services were terminated and the section 366.26 selection and implementation hearing had been set, the focus of the proceedings had shifted from Father's interest in the care, custody and companionship of the child to the child's best interests. (*In re Stephanie M.*, *supra*,

14

at p. 317; *In re Janee J.* (1999) 74 Cal.App.4th 198, 211.) Furthermore, Father's request for change must be viewed in the context of the dependency proceedings as a whole. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309–310; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528.) The juvenile court's focus at this stage of the proceeding was on the child's needs for permanency and stability. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 447; *In re Marilyn H.*, *supra*, at p. 309.)

The juvenile court's comments imply that Father was in the process of changing his circumstances. The court commented that Father's completion of substance abuse program was fairly recent and not of a very long duration. The court could not believe the program would graduate Father with only 60 days of sobriety. The court was also skeptical of the Department's recommendation for not questioning the program and for liberalizing visits given Father was only two months into sobriety.

Moreover, the juvenile court acted within its discretion in determining Father did not establish it was in the child's best interests to reinstate Father's reunification services in January 2013. The child had been a dependent of the court since she was approximately one week old in December 2010. The child never lived with Father who failed to reunify with her. Rather, the child had been living with her current caregivers since she was less than a week old. Although the child appeared to be happy when Father visited, the visits did not even begin happening until January 2012, well into the proceedings. The child was described as friendly and happy with everyone. There was no indication the child was upset when Father left. The child was happy to return to her caregivers, from whom she sought comfort when she was upset.

Father's modification petition was heard on the date of a continued section 366.26 permanent plan hearing. The modification request came after Father completed substance abuse programs, parenting classes, complied with drug testing, and agreed to participate in individual therapy. But, the modification petition was filed 20 months after the juvenile court orders to complete the programs. The modification was also requested four months after family reunification services were terminated. "Childhood does not wait for the parent to become adequate." (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 310.)

15

A child's best interests and need for stability are not promoted by delays in the selection of a permanent home for the child when there have been numerous failures to reunify with the child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47; *In re Edward H.* (1996) 43 Cal.App.4th 584, 594.) The juvenile court did not abuse its discretion by refusing to prolong the proceedings on the basis of Father's completion of court ordered programs so late in the proceedings.

## II.      The Exception to Termination of Parental Rights

Father does not claim the child was not adoptable. Rather, Father claims the juvenile court committed reversible error in failing to apply the exception to termination contained in section 366.26, subdivision(c)(1)(B)(i). We note there is some discrepancy between appellate courts as to the standard of review for a determination as to whether an exception to termination of parental rights applies sufficiency of the evidence or abuse of discretion. (Cf. *In re S.B.* (2008) 164 Cal.App.4th 289, 297–298 and *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [the determination of whether an exceptional circumstance exists is customarily challenged for sufficiency of evidence] with *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1342 [abuse of discretion applied to determination of whether parent-child exception existed] and *In re T.S.* (2009) 175 Cal.App.4th 1031, 1038 [Indian child exception].) Some courts apply a hybrid of the two standards. (*In re C.B.* (2010) 190 Cal.App.4th 102, 122–123; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315.) Under this standard, the juvenile court has discretion to resolve whether a statutory exception exists such that termination of parental rights would be detrimental to an adoptable child. (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1322; *In re Jasmine D., supra,* at p. 1342.) However, the juvenile court's pure factual findings are reviewed for substantial evidence. (*In re C.B.*, *supra*, at p. 122; *In re Jasmine D.*, *supra*, at p. 1351.) Under either standard, there was no reversible error in this case.

When a child is likely to be adopted, the preferred permanent plan, at a section 366.26 hearing, is adoption. (*In re Celine R.* (2003) 31 Cal.4th 45, 53; *In re Jasmine D., supra,* 78 Cal.App.4th at p. 1348.) The parent has the burden under that circumstance to raise any relevant exception in the juvenile court. (*In re C.F.* (2011) 193

16

Cal.App.4th 549, 553; *In re Erik P.* (2002) 104 Cal.App.4th 395, 402–403.)  The party asserting an exception has the burden of producing evidence showing it applies.  (*In re Celine R.*, *supra*, at p. 61; *In re Bailey J., supra,* 189 Cal.App.4th at p. 1314.)

Father claims he established the exception by showing regular and consistent visitation and that he and the child "are extremely bonded."  In determining whether the exception applies, the juvenile court should consider:  the age of the child; the portion of the child's life spent in the parent's custody; the positive and negative interaction between the parent and the child; and the child's particular needs.  (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1206; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576; see also *In re Amber M.* (2002) 103 Cal.App.4th 681, 689.)

"In the context of the dependency scheme prescribed by the Legislature, . . . the 'benefit from continuing the [parent/child] relationship' exception [means] the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.  [¶]  Interaction between natural parent and child will always confer some incidental benefit to the child.  The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.  [Citation.]  The relationship arises from day-to-day interaction, companionship and shared experiences.  [Citation.]  The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent."  (*In re Autumn H*., *supra*, 27 Cal.App.4th at p. 575.)

Father did not show he had a parental role as opposed to a mere friendship with the child.  (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 854 [parents must show at least

17

one biological parent occupies a parental role rather than a friendship].)  Rather, Father only showed frequent and loving contact with pleasant visits, which did not establish a parental role.  (See *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108, 1109 [parents are required to establish more than "'frequent and loving contact'" or an "emotional bond" accompanied by pleasant visits but must show "'parental role'"].)  Father did not produce any evidence that his relationship with the child had ever provided daily nurturing indicative of a strong parent-child bond.  (*In re Jamie R.* (2001) 90 Cal.App.4th 766, 774.)  Rather, the only evidence of such a bond was with her caregivers.

The child was over two years old when parental rights were terminated.  She had been living in her prospective adoptive family since she was about a week old.  The child's happy visits with Father were not unusual because her caregivers and daycare provider all described the child as friendly and happy.  Father had never provided for the child's daily needs or care.  The juvenile court did not err in terminating parental rights given the absence of evidence showing "the existence of such a strong and beneficial parent-child relationship" which "outweighs the child's need for a stable and permanent home."  (*In re Casey D., supra,* 70 Cal.App.4th at p. 51.)

18

## DISPOSITION

The order terminating parental rights is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. *

FERNS

We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ

---

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.